UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| JOSEPH WASKO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   CAUSE NO. 1:05-CV-280-TS |
| | ) |
| JAMES HERMAN, ALLEN COUNTY SHERIFF, SUSAN MAY, DANIEL VREDENBURG, FRANCES HARRIS, BRENDEN FECHER, CHAD RAY, CHRIS MAGDICH, KELLY MOSS, CHARLENE GREEN, JOEL ELLERT, and MATT MILLER, | ) |
| | ) |
| Defendants. | ) |

**OPINION AND ORDER**

The pro se Plaintiff, Joseph Wasko, sued the Allen County Sheriff and eleven individual employees of the Allen County Jail under 42 U.S.C. § 1983 for their roles in failing to provide adequate, timely, and necessary medical treatment during his incarceration at the Allen County Jail. This matter is before the Court on the Defendants' Motion for Summary Judgment [DE 62], filed on October 2, 2006.

**BACKGROUND**

On August 11, 2005, the Court received the Plaintiff's pro se prisoner Complaint against the Allen County Jail Commander, Kathryn Stevens, and motion for leave to proceed *in forma pauperis*. The Plaintiff alleged that he was denied medical treatment by several people after he was arrested and brought to the Allen County Jail on June 29, 2005. He stated that he was naming Stevens as a Defendant because she was the commanding officer of the jail and that the jail officers act on her behalf. On August 25, 2005, the Court granted the Plaintiff *in forma*

*pauperis* status. On September 7, the Court issued a screening order pursuant to 28 U.S.C. § 1915A. The Court concluded that because the Plaintiff did not allege that Stevens personally denied him treatment, she could not be liable for his alleged injuries under § 1983. However, she could be served with the Complaint as a senior jail official for the purpose of identifying the names of the proper defendants. Therefore, the Court ordered service on Stevens for the sole purpose of allowing the Plaintiff to conduct discovery to identify the individuals who he believes violated his constitutional rights.

On October 5, Defendant Stevens answered the Complaint. On November 1, the Plaintiff inquired, by letter, how to amend his complaint to add defendants and to assert a claim for punitive damages. On November 3, the Court denied the Plaintiff leave to amend his complaint because it was premature. On November 29, the Court appointed counsel for the Plaintiff for the purpose of conducting limited discovery and to amend the Plaintiff's Complaint to name the individual defendants.

On April 3, 2006, with the assistance of court-appointed counsel, the Plaintiff moved to amend his complaint to add ten individual Defendants, Susan May, Daniel Vredenburg, Frances Harris, Brenden Fecher, Chad Ray, Chris Magdich, Kelly Moss, Charlene Green, Joel Ellert, and Matt Miller. The Plaintiff also sought to add James Herman, Allen County Sheriff, in his official capacity. The First Amended Complaint still included Defendant Stevens and alleged that she failed, along with the other Defendants, to provide necessary medical treatment. After the Plaintiff's Motion to Amend was granted, the Court also granted his counsel's motion to withdraw.

On April 11, the Defendants answered the First Amended Complaint. On May 31, the

parties filed a stipulation to dismiss Defendant Stevens, with prejudice. On June 1, Defendant Stevens was dismissed from the suit.

On October 2, 2006, the remaining Defendants moved for summary judgment.

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). To determine whether any genuine issue of fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c), Advisory Committee Notes, 1963 Amendments. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex*, 477 U.S. at 323. In response, the nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th

Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598–99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, the Court must construe all facts in a light most favorable to the nonmoving party as well as view all reasonable inferences in that party's favor. *See Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000). The Court must consider the evidence as a jury might, "construing the record in the light most favorable to the nonmovant and avoiding the temptation to decide which party's version of the facts is more likely true." *Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1009 (7th Cir. 1999). The Court may not grant summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Pursuant to local rule, the Court is to assume that the facts claimed by the moving party and supported by admissible evidence are admitted to exist without controversy, except to the extent such facts are controverted in a "Statement of Genuine Issues" filed in opposition to the motion and supported by admissible evidence. N.D. Ind. L.R. 56.1(b).

**FACTS**

Construing all facts in a light most favorable to the Plaintiff, and viewing all reasonable inferences in favor of the Plaintiff, the following facts are assumed true for the purposes of summary judgment.

Early in the evening on June 28, 2005, the Plaintiff, a tattoo artist, began drinking at a friend's house, which is located near the intersection of Washington Boulevard and Broadway Street in Fort Wayne, Indiana, shortly after he finished giving himself a tattoo. The drinking was light at first, but it began to escalate around 10:30 p.m. All told, the Defendant consumed

between one and two and a half quarts of beer[1] and several shots of whiskey. Between 12:00 a.m. and 12:30 a.m. on June 29, the Plaintiff was arrested at 1601 Forest Park Boulevard, Fort Wayne, Indiana, for driving under the influence of alcohol and for driving a stolen vehicle. The Plaintiff took two blood alcohol tests, one which reported a blood alcohol content of .11 and the other which reported .14.

Fort Wayne Police Department Officer Joseph Difillipo was the arresting officer. During Officer Difillipo's arrest of the Plaintiff, the Plaintiff suffered an ulnar styloid tip fracture, which is a fracture to the tip of one of the wrist bones, as well as abrasions on his knees and wrists. The bleeding from the Plaintiff's wrists and knees was visible, and some of the blood soaked through the Plaintiff's shorts. The Plaintiff was not wearing a shirt. Officer Harmeyer and his partner (whose name the Plaintiff does not recall) transported the Plaintiff to the Allen County Jail.

After the Plaintiff arrived at the jail, around 2:30 a.m., he was escorted to the booking desk and his handcuffs were removed. Confinement officer Joe Ellert, a sheriff's deputy, removed the Plaintiff's belt and shoes.[2] Ellert told one or more officers or jail officials that the Plaintiff refused medical treatment. Pam Werling took the Plaintiff's fingerprints, and the Plaintiff believes she was careful in doing so because of the injury to the Plaintiff's wrist. The Plaintiff also alleges that Werling requested treatment for the Plaintiff, but since Ellert had said that the Plaintiff refused treatment, the Plaintiff was not treated right away.

The Defendant admits he was intoxicated at the time of his arrest and subsequent

---

[1] During his deposition, the Plaintiff recalled consuming one quart of beer (Def.'s Dep. 11, DE 62-2), but immediately after his arrest he recalled consuming two and a half quarts of beer. (Aff. for Probable Cause 2, DE 80-9; B-90 Examination Videotape, DE 61.)

[2] The removal of the Plaintiff's belt caused his shorts to lower and thus cover, at least to some degree, the scrapes on his knees.

booking, and he does not recall being asked any questions during the intake process. The testing procedure for intoxication was videotaped, and the Defendants manually filed a copy of the tape with the Court. (DE 61.)

Defendant Susan May was behind a desk during at least part of the booking procedure. She never spoke with the Plaintiff and "[s]he never looked over at [the Plaintiff]" other than from behind her desk while "doing her computer work." (Def.'s Dep. 30–31, DE 62-3.) May contacted the medical office about several inmates booked on the same day as the Plaintiff. She did not contact the medical office about the Plaintiff.

Defendant Matt Miller was also present during the Plaintiff's booking, and he was responsible for collecting the Plaintiff's property. The Plaintiff informed Miller of his injuries, and Miller responded "[w]e will get to that later, as soon as I am through getting your property." (Def.'s Dep. 44, DE 62-4.) Miller did not pursue any treatment for the Plaintiff.

Defendant Daniel Vredenburg was a security check officer that came by the Plaintiff's holding cell every hour during the C-shift (the late night shift that ends at 6:00 a.m.). The Plaintiff informed Vredenburg that he needed to see a nurse or a doctor about his wrist every hour when Vredenburg walked by. The Plaintiff showed his wrist to Vredenburg and said, "I think it is broken." (Def.'s Dep. 33, DE 62-4.) Vredenburg also processed an Inmate Medical Assessment in which he stated that the Plaintiff did not show visible signs of trauma and bleeding and did not complain of pain. Vredenburg did not provide any medical assistance for the Plaintiff's injuries.

The Plaintiff's wrist was "scabbing up" and he claims he was unable to clean it during this time, although he admits he never requested any soap to clean his wrist. (*Id.*) The Plaintiff

6

makes essentially the same accusations against Defendants Chris Magdich and Brenden Fecher as he does against Vredeneburg. They too were security check officers, and they did not attempt to assist the Plaintiff after he informed them of his wrist injury during their security checks.

Defendants Charlene Green and Kelly Moss are Qualified Medical Assistants, and in their positions they are responsible for distributing medications to inmates. They do not do inmate assessments or conduct diagnostic evaluations of inmates. For that, they refer inmates to the jail's nursing department. At about 7:10 a.m. on June 29, before the Plaintiff was taken to court, Green and Moss brought medication down to other inmates preparing to go over to court along with the Plaintiff. The Plaintiff informed Green and Moss that he needed to see someone because his wrist hurt and was swollen. The nurses responded that the Plaintiff should fill out a request for a sick call.

On the way to the courthouse on the morning of June 29, the Plaintiff asked the bailiff to be careful with the handcuffs and told him that he needed medical treatment. The bailiff responded that the Plaintiff could get treatment after court. (Def.'s Dep. 40, DE 62-4.)

Defendant Chad Ray helped pass out dinner trays at about 4:30 p.m. on June 29. The Plaintiff informed Ray of his injuries, and Ray did not provide any assistance or pass along the Plaintiff's request for medical treatment.

Francis Harris examined the Plaintiff at about 7:00 p.m. on June 29 for the standard Inmate Intake Examination. She cleaned the Plaintiff's wrist and knees with alcohol, dressed his wrist and knees, and had the Plaintiff transported to the hospital for x-rays. The Defendant intended to list Harris as a witness rather than as a Defendant. (Def.'s Dep. 42–43, DE 62-4.)

The Plaintiff was examined by Dr. Pettinger at St. Joseph's Hospital between 9:00 p.m.

and 10:00 p.m. on June 29. Dr. Pettinger prescribed Neosporin as an antibiotic for the abrasions and Tylenol for the pain, and he recommended that the Plaintiff wear a brace on his wrist. The Plaintiff refused the Tylenol because he believed it was harmful to the kidneys. He did not ask for any alternative pain medication. During this same visit, the St. Joseph's Hospital Radiology Department confirmed the fracture of the ulnar styloid tip.

On July 12, the Plaintiff refused to go to sick call for more treatment on his wrist. The Plaintiff believed he was taking care of it adequately on his own, and he believed "[i]t was worse going down there, th[a]n it was good for it. They would jerk the scabs right off of it and then they would try to clean it and it was trying to heal and it [sic] just going to scar worse than it did, so I just took care of it on my own." (Def.'s Dep. 56, DE 62-5.)

The Plaintiff again visited St. Joseph's Hospital in August and October 2005 while he was incarcerated at the Allen County Jail. He received two cortisone injections and, as of the date of his deposition, continued to wear a brace on his wrist.

## DISCUSSION

**A.    Defendants Stevens, May, Vredenburg, Harris, Fecher, Ray, Magdich, Moss, Green, Ellert, and Miller – Individual Capacities**

**1.    *Applicable Standard***

Because the Plaintiff complains of treatment as a pretrial detainee prior to a judicial determination of probable cause, the Fourth Amendment governs. *Lopez v. City of Chi.*, 464 F.3d 711, 719 (7th Cir. 2006) ("[W]e have held that the 'Fourth Amendment governs the period of confinement between arrest without a warrant and the preliminary hearing at which a determination of probable cause is made, while due process regulates the period of confinement

after the initial determination of probable cause.'") (quoting *Villanova v. Abrams*, 972 F.2d 792, 797 (7th Cir. 1992)).³ The deliberate indifference standard of the Eighth and Fourteenth Amendments, which the parties refer to, "requires a higher showing on a plaintiff's part than is necessary to prove an officer's conduct was 'objectively unreasonable under the circumstances.'" *Williams v. Rodriguez*, No. 06-4126, 2007 WL 4258679, at *8 (7th Cir. Dec. 6, 2007).

To determine whether a jail official's conduct is objectively unreasonable with respect to an arrestee's medical care, a court must evaluate four factors. The first factor is whether or not the official had notice of an arrestee's medical need, either by word or through observation of physical symptoms. *Id.* Second, a court must consider the seriousness of the medical need. *Id.*⁴ Third, the court must examine the scope of the requested treatment. *Id.* The second and third factors are closely related. "The Fourth Amendment's reasonableness analysis operates on a sliding scale, balancing the seriousness of the medical need with the . . . the scope of the requested treatment." *Id.* For the fourth and final factor, a court must take into account wide-ranging police interests, including administrative, penological, or investigatory considerations. *Id.*

---

³ To be precise, the Plaintiff claims he was denied treatment both before and after his preliminary hearing, although the current record does not indicate exactly what time this hearing took place. As such, the objective reasonableness standard of the Fourth Amendment would apply to the alleged delay in treatment prior to the Plaintiff's preliminary hearing, and the deliberate indifference standard of the Eighth and Fourteenth Amendments would apply to the alleged delay in treatment afterwards. It is not entirely clear with respect to some of the Defendants whether their alleged neglect occurred before or after the judicial determination of probable cause was made. Because the Plaintiff's claims all fail even under the more plaintiff-friendly standard of objective reasonableness, the Court will utilize the objective reasonableness standard.

⁴ It is not necessary for the seriousness of the medical need to rise to the level of objective seriousness that is required under the Eighth and Fourteenth Amendment's deliberate indifference standard. *Williams*, 2007 WL 4258679, at *8 (7th Cir. Dec. 6, 2007).

**2.**     *Analysis of Four Factors for Determining Objective Reasonableness*

a.     *Notice*

Accepting the Plaintiff's view of the facts so far as it is supported by admissible evidence, there is no dispute that the Defendants were all generally on notice that the Plaintiff was in need of medical care. The Plaintiff alleges that he verbally notified each jail employee with whom he came in contact that he needed medical treatment. The jail, agreeing at least to some degree with the Plaintiff's evaluation of his injuries, cleaned the Plaintiff's wounds and transported him to St. Joseph's Hospital for x-rays the evening of his arrest.

While the Defendants were generally on notice that the Plaintiff was in need of medical care, the Plaintiff is not claiming that he was denied care altogether. Rather, he is claiming that he did not receive the appropriate care soon enough. Accordingly, the relevant notice would not be merely that the Plaintiff was in need of some care, but rather notice that the Plaintiff was in need of care sooner than he received it. Examining the notice requirement in this light, no Defendant was on notice that the Plaintiff was in need of care sooner than he received it.

The first reason that no Defendant was on notice that the Plaintiff was in need of care sooner than he received it is that, based on the Plaintiff's evidence, there was no such need. For the Plaintiff to claim that he needed care in a more expeditious fashion than he received it, he would need to show that the expedited care was necessary to relieve significant pain or to ensure optimal healing. The Plaintiff has made neither showing. As for the pain, once the Plaintiff was examined, he was prescribed medication for the pain, and he refused the medication. He was certainly within his rights to do so, but his refusal completely negates any claim that the Defendants caused him enhanced suffering. Likewise, the Plaintiff has not designated any

admissible evidence indicating that being transported to the hospital sooner would have impacted the manner in which his wrist healed or the duration of the healing.[5] As for any other claimed injuries, when the Plaintiff had the opportunity to receive further treatment from the jail through sick call, he refused it.

Secondly, even accepting the Plaintiff's allegations as to his physical symptoms, those symptoms would not alert an objectively reasonable jail official that the Plaintiff needed treatment more quickly. The Plaintiff notes that he can be seen favoring his wrist in the videotape of the B-90 examination. (Pl.'s Resp. to Def.'s Mot. for Summ. J. 13, DE 80.) It is true that there are periods on the tape where the Plaintiff demonstrates discomfort in his wrist, but his behavior also indicates that his discomfort is not substantial. At several points in the video the Plaintiff uses his injured wrist to pull up his pants, emphatically swings his injured wrist through

---

[5] The Plaintiff does claim in his deposition that the delay impacted the healing process for his wrist, but he does not back this claim up with any admissible evidence.

> Q.   Has any doctor ever told you that the delay in getting to the hospital between let's say the early morning hours after you were arrested at the lock up . . . say between 3:00 in the am and not getting there until maybe 9:30 or 10:00 later that day — did that make any difference in the outcome of your wrist?
>
> A.   I asked Dr. Konkin that question, if it would make any difference — like you said, and he said if you would have come in here right away we probably could have set the bone back to where it was so it wouldn't be out of place and it would have reduced some cartridge [sic] build up.
>
> Q.   Who is Dr. Konkin?
>
> A.   Taylor Konkin, he didn't write it out for me. I wrote him and asked him to put that in writing for me. He never responded. I am going to have to see if I can't get that in writing. I don't have an attorney anymore. It is hard for me to get any of this stuff done.

(Def's Dep. 57–58, DE 62-5.) Dr. Konkin's statement is of course hearsay, Fed. R. Evid. 801, and therefore cannot be used as evidence to create a genuine issue of material fact. *See Bombard v. Fort Wayne Newspapers,Inc.*, 92 F.3d 560, 562 (7th Cir. 1996) ("The evidence relied upon must be competent evidence of a type otherwise admissible at trial."). The Plaintiff has not designated any admissible evidence suggesting that speedier treatment would have led to more effective healing.

the air while gesturing, leans against the wall using his injured to support his weight, and he even uses his injured wrist to balance his weight against the wall while preparing for one of the intoxication tests. Similarly, there are no indications of other injuries visible on the tape. This behavior, viewed by a reasonable jury in a light most favorable to the Plaintiff, would not indicate to a reasonable and objective observer that the Plaintiff was in need of treatment sooner than he received it.

b.   *Seriousness of the Medical Need*

During his arrest, the Plaintiff suffered an ulnar styloid tip fracture to his left wrist as well as abrasions to his knees and wrists. It is the fracture of the ulnar styloid tip that is the crux of this case. The Defendants have produced a helpful diagram of the bones in the wrist, the accuracy of which the Plaintiff does not contest. Because the diagram is useful for evaluating the seriousness of the injury, the Court reproduces it here.



(Def.'s Mot. for Summ. J., Ex. A, DE 62-23). As the diagram indicates, the fracture is only to the tip of one of the bones in the Plaintiff's wrist.

12

Caselaw does not clearly establish the factors that this Court must consider in determining the seriousness of the Plaintiff's medical needs under the Fourth Amendment as it relates to his delayed treatment. The Seventh Circuit has explained that the seriousness of the medical need under the Fourth Amendment standard need not rise to the level of objective seriousness under the Eighth and Fourteenth Amendment's deliberate indifference standard, at least with respect to the claims that arose during the period of time prior to a judicial determination of probable cause. *Williams*, 2007 WL 4258679, at *8. While the Plaintiff's showing does not need to be as high as the deliberate indifference standard, the Court looks to the same factors.

The Eleventh Circuit has explained that the "'seriousness' of an inmate's medical needs . . . may be decided by reference to the *effect* of delay in treatment." *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1188 (11th Cir. 1994), *abrogated on other grounds by Hope v. Pelzer*, 536 U.S. 73 (2002). Accordingly, an "inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Id.* The Eighth Circuit also requires this proffer of evidence. *See Reece v. Groose*, 60 F.3d 487, 491 (8th Cir. 1995) ("[A]n inmate who claims that delay in medical treatment rose to the level of a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment.") The Seventh Circuit "agree[s] with the Eighth Circuit that '[a]n inmate who complains that delay in medical treatment rose to a constitutional violation must place *verifying medical evidence* in the record to establish the detrimental effect of delay in medical treatment to succeed.'" *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996) (quoting *Beyerbach v. Sears*,

13

49 F.3d 1324, 1326 (8th Cir. 1995)).

Consistent with the Seventh, Eighth, and Eleventh circuits, the Tenth Circuit determines objective seriousness by deciding whether the delay in medical care resulted in "substantial harm." *See Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (2001). The First Circuit determines seriousness by referring "to the effect of the delay of treatment." *Gaudreault v. Municipality of Salem, Mass.*, 923 F.2d 203, 208 (1st Cir. 1990) (per curiam) (affirming summary judgment in part because "[t]here is nothing in the record to suggest that Gaudreault's injuries were exacerbated in the slightest by the delay in providing treatment").

The Fourth Circuit also seems to take an approach similar to its sister circuits. In *Martin v. Gentile* it was undisputed that when the § 1983 plaintiff had "arrived at the stationhouse he had a cut over one eye, a quarter-inch piece of glass embedded in his palm, and bruises on his shoulders and elbows." 849 F.2d 863, 871 (4th Cir. 1988). At the time, the plaintiff thought his elbows were broken, although they were not. *Id.* at 866. The plaintiff did not receive medical care until fourteen hours after his arrest. *Id.* at 866. Nonetheless, the Fourth Circuit concluded that the plaintiff failed to establish that he had serious medical needs that demanded quicker treatment because "[t]here [was] no suggestion that the delay in taking him to the hospital exacerbated his injuries in any way." *Id.* at 871.

Although the "seriousness" element under the Fourth Amendment is less stringent than under the Eighth and Fourteenth Amendments, the level of seriousness is still determined by looking to the effect of the delay in treatment and whether any harm was caused by the delay. The Plaintiff does not designate any evidence that his pain was extraordinary or that his injuries were of the sort that demanded immediate medical attention. The Plaintiff also does not

14

designate any evidence indicating that there was any appreciable effect from the 17 hour delay in treatment. While the Plaintiff may not need to establish "substantial harm," as the Tenth Circuit requires under the deliberate indifference standard, he must at least establish some harm. He has not done so. Accordingly, no reasonable jury could make such a finding.

c.      *Scope of Requested Treatment*

This factor does not add much to the analysis in this case. The scope of the treatment that the Plaintiff received was exactly what he requested. He wanted a medical professional to examine his injured wrist, and the jail transported him to a local hospital for x-rays and treatment. The Plaintiff's suit, then, can only be based on his contention that he desired treatment sooner. The entire time span from arrest to treatment, under the Plaintiff's view of the facts, was 17 hours. Since this period included the conclusion of his arrest and booking, as well as being transported to court for the determination of probable cause, the Plaintiff's only quarrel is that he believes he should have been treated a few hours sooner. Given that the need for more immediate medical care was not serious, and the scope of the treatment included x-rays, a reasonable jury could not find that the jail's processing of the Plaintiff, through the Defendants' actions, was objectively unreasonable.

d.      *Police Interests*

Finally, the Court must take into account police interests in determining whether the Defendants' conduct was objectively unreasonable. *Williams*, 2007 WL 4258679, at *8. These considerations include administrative, penological, and investigatory interests. *Id.* The Plaintiff's designated evidence, particularly the shift logs, demonstrate that each day the jail must process

15

and supervise numerous inmates. During the C-shift alone the jail attended to the medical needs of at least seven inmates. (Jail Log, DE 80-2 at 11.) Given the deference that must be afforded to the jail in determining the manner in which it will process inmates and attend to their needs, neither this Court nor any reasonable jury could say that the jail officials' care of the Plaintiff was objectively unreasonable.

**3.** *Conclusion*

The Court does not doubt the Plaintiff's sincerity when he claims that his ulnar styloid tip fracture and minor abrasions were painful. However, as far as injuries go, these were not serious ones. The Defendants had no notice that quicker treatment was required because there was no such need and because the Plaintiff's physical symptoms did not indicate that treatment was needed immediately. The delayed treatment caused the Plaintiff no harm. Based on the Plaintiff's own evidence, quicker treatment would not have alleviated his pain and would not have hastened his recovery.

Given the numerous competing demands on jail officials as they care for and supervise the detainee population, it is not the province of this Court or a jury to determine whether the jail's processing of the Plaintiff was ideal. The only question that can properly go before the jury is whether any inadequacies in the Defendants' performance of their responsibilities at the jail rose to the level of a constitutional deprivation. Because the Plaintiff has not designated any admissible evidence that would permit a reasonable jury to conclude that the Defendants' behavior was objectively unreasonable, the Defendants' motion for summary judgment must be granted.

**B.     Defendant James Herman – Official Capacity**

The Plaintiff has sued Defendant Herman in his official capacity "for maintaining a faulty, inadequate and/or reckless policy or failure to maintain a policy with regard to the timely delivery of medical care/treatment to inmates of the Allen County Jail including the Plaintiff." (First Am. Compl. 1, DE 47.) This claim must also fail.

There are three ways in which a municipality or local governmental unit can violate 42 U.S.C. § 1983. First, a violation can occur through "an express policy that, when enforced, causes a constitutional deprivation." *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005). Second, a constitutional deprivation that results from a "'wide-spread practice' that although not authorized by written law and express policy, is so permanent and well-settled as to constitute a 'custom or usage' with the force of law" violates the statute. *Id.* Third, a municipality or governmental unit can violate the statue if "the constitutional injury was caused by a person with 'final decision policymaking authority.'" *Id.*

As explained above, the Plaintiff did not suffer any constitutional deprivation, so there can be no municipal liability. Even if the Plaintiff had suffered a constitutional deprivation, he designates no evidence of a policy or wide-spread practice to violate inmates' constitutional rights, and accordingly no reasonable jury, construing the facts in a light most favorable to the Plaintiff, can impose liability on the Defendant. Not only does the Plaintiff fail to designate evidence of a formal policy, he fails to point to even a single other incident where an inmate's medical care or treatment was inadequate. In fact, he claims the opposite. According to the Plaintiff, "Susan May, who was assigned to 'medical,' repeatedly called nursing to advise them that there were new intakes who needed screened. Even an inmate booked into Lock-up 10

17

minutes prior to Plaintiff[']s booking was referred to the nursing staff to be screened . . . ."

Because the Plaintiff fails to designate evidence of a formal policy or wide-spread practice to deprive inmates of their constitutional rights, the Defendant cannot be held liable under 42 U.S.C. § 1983 for any delay in treatment.

The "failure to make a policy" claim is likewise doomed.

> Where a municipality has failed to make a policy in a situation that calls for procedures, rules, or regulations, the failure itself might be actionable, if, as the Supreme Court emphasized in *Collins* [*v. City of Harker Heights*, 503 U.S. 115, 123–24 (1992)], the complaint otherwise alleges a constitutional violation. In those situations, however, the plaintiff generally must allege a pattern or series of incidents of unconstitutional conduct or a clear constitutional duty to take action because the situation was certain to recur. The plaintiff must support those allegations under Fed. R. Civ. P. 56(e) to withstand summary judgment. In addition, the municipality's inaction must amount to deliberate indifference, so that it is fair to infer that the inaction is itself a "policy."

*Harris v. City of Marion, Ind.*, 79 F.3d 56, 58–59 (7th Cir. 1996) (citations omitted). Here again, because the Plaintiff did not suffer a constitutional violation, the failure to make a policy claim must fail. Notwithstanding this fatal defect in the claim, the Plaintiff has also neglected to allege, or designate evidence indicating, a pattern of failures to properly process detainees with medical needs. Without such a pattern or series of incidents, a duty to promulgate a policy does not arise. If the Defendant had no duty to promulgate a policy, he cannot be liable for damages for failing to do so.

## CONCLUSION

The Plaintiff's suit seems to be more of a complaint about bureaucratic processing than it is about the deprivation of any constitutional rights. The complaint does not complain of the

injury itself, the fracture to the ulnar styloid tip. The Plaintiff's frustration grows from the fact that when he alerted several employees of the Allen County Jail to his discomfort, he did not receive a response to his satisfaction. Some ignored him, and others referred him elsewhere. But based on the Plaintiff's own evidence, he did receive at least the minimum amount of care to which he was entitled. He was examined and cared for by a nurse at the jail, and he was transported to a local hospital for x-rays and treatment, all on the same day as his arrest. It is understandable that some of the Defendants' disinterest in the Plaintiff's injury frustrated him, but that does not constitute a constitutional deprivation.

## ORDER

For the foregoing reasons, the Defendants' Motion for Summary Judgment [DE 62] is GRANTED. Judgment will be entered in favor of the Defendants and against the Plaintiff.

SO ORDERED on January 14, 2008.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT